**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Josephine LEDEZMA (92–6683) and Terry Zajac (93–5182), Defendants–Appellants.**

**Nos. 92–6683, 93–5182.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 9, 1993.

Decided June 10, 1994.

Rehearing Denied Aug. 1, 1994.

Daniel A. Clancy, U.S. Atty., Timothy R. DiScenza, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Memphis, TN, for the U.S.

Robert Ramos (argued and briefed), El Paso, TX, for Josephine Ledezma.

Before: GUY and RYAN, Circuit Judges; and WELLFORD, Senior Circuit Judge.

RYAN, Circuit Judge.

Josephine Ledezma was indicted for running an illegal family business: an interstate conspiracy to transport 1,600 kilograms of cocaine. According to the indictment, Terry Zajac was one of her minions. A jury convicted Ledezma and Zajac of conspiracy to possess 1,600 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count 1); and aiding and abetting in the possession of 351 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count 2). In this appeal, both defendants challenge their convictions and sentences.

We affirm Ledezma's conviction and life sentence. As to Zajac, we affirm his conspiracy conviction, reverse his conviction for aiding and abetting, vacate his sentence, and remand for resentencing.

I.

This is another in a seemingly endless stream of drug distribution cases. David Edmonds, a sheriff's deputy in Shelby County, Tennessee, was among the first witnesses to testify at trial. He explained that on November 23, 1990, he stopped a Ford van on I–40 in Memphis, Tennessee, for speeding. The deputy stated that he asked permission to search the van after his suspicions were roused by the driver's nervousness and evasiveness. The driver, Jeffrey Ferrer, consented, and the deputy found fifteen packages of cocaine under a built-in cooler. The deputy then arrested Jeffrey Ferrer and his brother Eldon Ferrer, a passenger. An inventory search revealed a total of 351 kilograms of cocaine stashed in the van. Another officer, Lanny Hughes, testified that he found a piece of paper in the van with directions from Los Angeles to Washington, D.C. via Memphis.

Corbett Hart, a Drug Task Force Coordinator for the FBI, testified that law enforcement authorities, including of the FBI and the DEA, allowed the Ferrer brothers to continue their trip to Washington, D.C. in order to make a controlled delivery and to arrest the recipients and those orchestrating the delivery. En route, the brothers continued to make check-in calls to their superiors, and Hart testified that he was present on one occasion when Jeffrey Ferrer called defendant Ledezma at her home in suburban Los Angeles. Two of those calls were taped by the FBI.

Jeffrey Ferrer testified that en route to Washington he did indeed make check-in calls to Ledezma. Ferrer described how his father introduced him to Ledezma and how Ledezma recruited him to deliver the van with a promise to pay him and his brother each $2,000. According to Ferrer, Ledezma then showed him a map of the route and ordered him to call in from specific check points. Ferrer also identified a business card found in the van with Ledezma's phone number.

Jeffrey Ferrer's father, Robert Ferrer, also testified. The elder Ferrer explained that he was recruited by Manny Castellano,

Ledezma's brother, and paid $4,000 to drive a van containing cocaine to Detroit. In a curious display of paternal interest, Ferrer asked Castellano whether his two unemployed sons—Jeffrey and Eldon—could make similar deliveries. With Castellano's assistance, Ferrer secured an audience with Ledezma at her home, where he introduced his sons to Ledezma. According to Ferrer, Ledezma proceeded to instruct the younger Ferrers on how to deliver the van. Robert Ferrer testified that Ledezma also promised to pay each of his sons $2,000 upon their return.

Robert Ferrer further explained that after his sons left Los Angeles with the van, Castellano became concerned because the younger Ferrers were not calling in from all of the agreed upon check points. When the Ferrers arrived in Washington, they called their father to inquire about returning to California. Robert Ferrer then approached Castellano who told him that the deal in Washington was off and the van had to be delivered to Amarillo, Texas. Castellano gave Robert Ferrer $1,000 and dispatched him to Washington with instructions to drive the van to Texas.

Robert Ferrer and his wife flew to Washington and met their sons. This reunion was short lived, however, because Robert Ferrer was soon confronted by the police. Ferrer agreed to work with the authorities and to make a controlled delivery of the van in Amarillo, Texas. Robert Ferrer testified that he drove the van to Texas and then flew home to Los Angeles. When he returned home to California, Ferrer called Castellano. Castellano told Ferrer that defendant Terry Zajac would pay him for the delivery. Wearing an FBI wire, Ferrer met Zajac in the parking lot of a local restaurant. Ferrer testified that Zajac took $3,500 out of the trunk of his car and gave it to him, telling him "we did a good job and that everybody was happy with the way that we were delivering the vans and not touching anything inside."

Ricardo Rios, Ledezma's cousin and Castellano's confidant, testified that he agreed to "baby-sit" a house in Fontana, California, where 1,600 kilograms of cocaine was stored.

Rios described how he helped load the van destined for Washington with 351 kilograms of cocaine. Further, Rios explained how he picked up the Ferrer brothers at Ledezma's house and turned the van over to them. Several days after the Ferrers departed, Rios testified that Castellano began to suspect that the van "had a fly in it"—an unsavory metaphor suggesting that the van had been intercepted by the police. Rios testified that Castellano, fearing the conspiracy had been compromised, came with Zajac to the house where Rios was staying, and together they loaded 244 kilograms of cocaine into a GMC Blazer. They left the truck in the garage, and Rios moved from the house to an apartment with Castellano and Zajac.

Detective Richard Bitonti, a police officer in Rialto, California, testified that he executed a search warrant on December 4, 1990, for the residence in Fontana, California, and seized 244 kilograms of cocaine in the GMC Blazer parked in the garage. The following day, Detective Bitonti executed a search warrant of Ledezma's house and found an Ohaus gram scale in the garage.

Josephine Ledezma took the stand in her own defense and offered an innocent explanation for the evidence against her. She denied any knowledge of the Ohaus scale found in her garage. She explained that the Ferrer brothers had asked her for directions to Washington. Ledezma further testified that it was Robert Ferrer who insisted that his sons call her if they encountered any difficulties on their trip. Ledezma explained that she intended only to relay these messages to her brother, Manny Castellano. Finally, in response to the government's evidence that she requested that her telephone service be disconnected shortly after the Ferrer brothers failed to check in, Ledezma testified that she cut off the telephone service to her house because her father and brother were charging calls to her phone number.

Zajac also testified. He denied that he assisted Ledezma and Castellano in distributing cocaine. He also denied meeting with Robert Ferrer and paying him on behalf of Castellano.

At the close of the evidence, the defendants moved for a judgment of acquittal based on insufficient evidence. The district court denied the motions, and the case went to the jury. The jury found Ledezma and Zajac guilty of both conspiracy to possess cocaine with intent to distribute (count 1), and aiding and abetting in the possession of cocaine with intent to distribute (count 2). The district court then sentenced Ledezma to life in prison, and Zajac to 292 months imprisonment with a five-year period of supervised release. The defendants now appeal their convictions and sentences.

## II.

### A. Convictions

Ledezma and Zajac each argue that the district court erred in finding sufficient evidence to support their convictions. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Lee*, 991 F.2d 343, 347 (6th Cir.1993).

### 1. Conspiracy

Ledezma and Zajac claim that the evidence is insufficient to sustain their convictions for conspiracy to possess cocaine with intent to distribute under 21 U.S.C. §§ 841(a)(1) and 846. Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846 (1988).

■ To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove "'that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it.'" *United States v. Barrett*, 933 F.2d 355, 359 (6th Cir.1991) (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986)). The

essence of conspiracy, of course, is agreement, but proof of a formal agreement is not necessary; "a tacit or material understanding among the parties" will suffice. *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990), *cert. denied*, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991). "'A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir.1991) (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985)), *cert. denied*, —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991), and *cert. denied*, —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement. Further, the connection between the defendant and the conspiracy need only be slight. *Id.*

#### a. Ledezma

■ Ledezma claims that there is no direct evidence that she was a knowing participant in the cocaine conspiracy; she does not challenge her conviction for aiding and abetting. Ledezma maintains that the evidence against her is circumstantial and that she stands convicted solely because of her familial associations. The evidence presented at trial, however, entitled the jury to conclude otherwise.

■ Ledezma testified that her brother, Manny Castellano, was a frequent visitor at her home. Castellano used Ledezma's telephone regularly, and he used Ledezma's house to meet with other members of the conspiracy. Further, Ledezma admitted that she received phone calls on behalf of her brother, and she periodically took messages for him. But Ledezma cannot be convicted of conspiracy merely because she associated with members of the conspiracy. *See Lee*, 991 F.2d at 348.

Ledezma, however, did more than merely associate with the members of the conspiracy. Three of Ledezma's codefendants, Ricardo Rios, Robert Ferrer, and Jeffrey Ferrer,

each testified that Ledezma orchestrated the delivery of the cocaine right down to mapping out the travel route. Jeffrey Ferrer testified that Ledezma required him to deliver status reports from prearranged check points. Ferrer also identified a business card found in the van as one Ledezma had given him. The card had two phone numbers on it: Ledezma's home number and an Arizona number belonging to her brother Manny Castellano. Ferrer testified that he called and checked in with Ledezma at both numbers. Ferrer also testified that Ledezma recruited him into the conspiracy as a drug courier.

■ This evidence, although much of it circumstantial, heavily incriminates Ledezma. Circumstantial evidence on its own can sustain a jury's verdict, and such circumstantial evidence need not remove every reasonable possibility of doubt. *United States v. Townsend*, 796 F.2d 158, 161 (6th Cir.1986). Although Ledezma offered an innocent explanation for the incriminating facts proved by the government, the jury was free to disbelieve her. We conclude, therefore, that there was sufficient evidence from which a rational jury could find that Ledezma knowingly participated in the conspiracy to possess cocaine with intent to distribute.

### b. Zajac

■ Zajac maintains that the evidence was not sufficient to sustain his conviction for conspiracy, or his conviction for aiding and abetting.

As to the conspiracy, Zajac argues there is no direct evidence that he knowingly participated in the scheme. Of course, this court has held that the " 'connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt.' " *Barrett*, 933 F.2d at 359 (quoting *Christian*, 786 F.2d at 211). While Zajac is correct that his mere presence at Ledezma's home and his sharing an apartment with Castellano and Rios is insufficient evidence on which to convict, he ignores the fact that he actively participated in the conspiracy when he helped Castellano and Rios remove the cocaine from the house in Fontana, California.

Moreover, acting as Castellano's agent, Zajac paid Robert Ferrer for driving the van from Washington, D.C., to Amarillo, Texas. Therefore, we conclude that there was sufficient evidence from which a rational jury could find that Zajac knowingly participated in the conspiracy to possess cocaine with intent to distribute.

### 2. Aiding and Abetting

Zajac's conviction for aiding and abetting in the possession of 351 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, presents a more difficult question. The United States Code provides that "[w]hoever ... aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal." 18 U.S.C. § 2(a) (1988). Judge Learned Hand read the statute to require that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). Judge Learned Hand's formulation has become the accepted standard for imposing accomplice liability under 18 U.S.C. § 2(a). *See Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949); *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992) (*en banc*), *cert. denied*, — U.S. ——, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993).

■ As we observed in *United States v. Winston*, 687 F.2d 832, 834 (6th Cir.1982), "[d]rawing an exact line of sufficient participation [to support a conviction for aiding and abetting], especially in drug distribution cases, is difficult if not impossible." To prove aiding and abetting, the government must show that Zajac knew that the principals possessed cocaine with the intent to distribute it, and that Zajac assisted in their plan to deliver the cocaine. *United States v. Pena*, 983 F.2d 71, 72 (6th Cir.1993). It is not necessary, however, for the government to show that Zajac actually or even constructively possessed the cocaine. *Winston*, 687 F.2d at 834 n. 2, 835.

■ We think the evidence presented is insufficient to support Zajac's conviction for aiding and abetting. The first evidence of Zajac's involvement in the criminal venture is his assisting Castellano and Rios in loading a truck with 244 kilograms of cocaine, but, of course, that was unrelated to the 351 kilograms in the van driven by the Ferrer brothers. Rios's testimony establishes that Zajac entered the conspiracy several days after the Ferrer brothers left Los Angeles. Thus, Zajac did not assist his principals' possession in a typical aiding and abetting scenario under section 841 by acting as a "lookout," *United States v. Martin,* 920 F.2d 345, 348 (6th Cir.1990), *cert. denied,* 500 U.S. 926, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991); *United States v. Poston,* 902 F.2d 90, 94–95 (D.C.Cir. 1990); a supplier, *United States v. Brantley,* 733 F.2d 1429, 1434–35 (11th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); or a middleman procuring customers, *United States v. Frorup,* 963 F.2d 41, 43 (3d Cir.1992); *United States v. Wesson,* 889 F.2d 134, 135 (7th Cir.1989).

The government argues that the same evidence that proved Zajac's participation in the conspiracy to possess the cocaine with intent to distribute is sufficient to support Zajac's conviction for aiding and abetting in the possession of cocaine with intent to distribute. While some cases relying on *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), have so held, *see, e.g., United States v. Salazar,* 958 F.2d 1285, 1292 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 185, 121 L.Ed.2d 129 (1992); *United States v. Collazo,* 815 F.2d 1138, 1144–45 (7th Cir.1987), we think they are distinguishable from this case. In *Salazar* and *Collazo,* each defendant had a prolonged association with the conspiracy, an association that predated the commission of the substantive crime the defendant was convicted of aiding and abetting. Thus, the facts in *Salazar* and *Collazo* were such that it could reasonably be inferred that a defendant's continued participation in a criminal enterprise aided and abetted a coconspirator's subsequent crime. In contrast, no such inference can be drawn here where it is apparent that the specific crime of possession with intent to distribute, as it related to the 351 kilograms of cocaine

in the van, had already commenced when Zajac joined the conspiracy.

The only connection between Zajac and the 351 kilograms of cocaine is the evidence that Zajac paid Robert Ferrer for delivering the van. This, however, did not occur until after the van was confiscated by the authorities. Zajac argues that the crime was over and done with by the time he paid off Ferrer, and that he cannot be convicted of aiding and abetting the substantive offense of possession of cocaine with the intent to distribute it once the principals were no longer in possession of the cocaine. The government argues that the principals' possession of the cocaine is irrelevant since all the government needs to prove is that Zajac intended to facilitate the commission of a crime by another.

■ We agree with the government that the essence of the crime of aiding and abetting is the defendant's offering assistance or encouragement to his principal in the commission of a substantive offense. *See* Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 63 (1972); *see also* Charles E. Torcia, *Wharton's Criminal Law* § 29 (15th ed.1993). But one cannot aid and abet a completed crime. *Roberts v. United States,* 416 F.2d 1216, 1221 (5th Cir.1969); *see also United States v. Shulman,* 624 F.2d 384, 387 (2d Cir.1980); *United States v. Murry,* 588 F.2d 641, 646 (8th Cir.1978); *United States v. Keach,* 480 F.2d 1274, 1287 (10th Cir.1973). And we do not think Zajac's activity can properly be characterized as intended to help or to encourage the commission of a crime.

The United States Code makes it a crime to "possess with intent to ... distribute ... a controlled substance." 21 U.S.C. § 841(a)(1) (1988). Here the possession of the cocaine by the other members of the conspiracy was an accomplished fact when Zajac entered the conspiracy. Moreover, by the time Zajac paid Ferrer for making the delivery, the police had already seized the cocaine and arrested several of Zajac's coconspirators. Zajac did nothing to assist his coconspirators in the substantive offense relating to the 351 kilograms of cocaine in the van, because his coconspirators had already

completed the crime. Perhaps Zajac might well have been charged and convicted under 18 U.S.C. § 3 as an accessory after the fact, or on some other theory, *see* Sharon C. Lynch, Comment, *Drug Kingpins and Their Helpers: Accomplice Liability Under 21 USC § 848,* 58 U. Chi. L.Rev. 391 (1991), on the basis that his paying Ferrer was an effort to help his coconspirators avoid detection, but such was not the indictment in this case.

■ We recognize that aiding and abetting a drug offense may encompass activities, intended to ensure the success of the underlying crime, that take place after delivery and after the principal no longer possesses the narcotics. In *United States v. Coady,* 809 F.2d 119, 124 (1st Cir.1987), a defendant who made assurances to the purchasers of narcotics concerning the quality of drugs previously delivered was convicted of aiding and abetting an offense under 21 U.S.C. § 841(a)(1), because his declarations were intended to secure payment for the drugs and to facilitate "the financial climax of the deal." In *United States v. Orozco–Prada,* 732 F.2d 1076, 1080 (2d Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984), a defendant was convicted of aiding and abetting a conspiracy to distribute cocaine because he laundered proceeds from drug sales, thus furthering the distribution of the narcotics. *See also United States v. Perez,* 922 F.2d 782, 785–86 (11th Cir.), *cert. denied,* 501 U.S. 1223, 111 S.Ct. 2840, 115 L.Ed.2d 1009 (1991). In this case, however, Zajac's putative participation was not part of an ongoing crime (*Coady*) nor was it a recurring contribution to a continuing crime (*Orozco–Prada*). We conclude, therefore, that there is insufficient evidence from which a rational jury could convict Zajac of aiding and abetting in the possession of cocaine with intent to distribute.

### B. Sentences

#### 1. Ledezma

■ Ledezma raises two challenges to her sentence. First, she argues that the district court clearly erred in enhancing her sentence for obstruction of justice. Under the sentencing guidelines, a sentencing judge may enhance a defendant's offense level by two points "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1. Committing perjury is listed in the sentencing guidelines as an example of obstruction of justice. *Id.* at comment. (n.3(b)).

At Ledezma's sentencing hearing, the prosecution recounted Ledezma's alleged lies before the district court:

> She took the stand. She lied. She told an absolute preposterous story all through this about everything that happened from the time the Ferrers got there, including her flight to Mexico, and her attempts to— the Court may recall ... her story about going across the border to ... use a pay phone to cancel her phone up in the Los Angeles area. All of that clearly in response to this organization[']s realization that they had been penetrated by law enforcement. She absolutely denied on the stand any knowledge whatsoever of any of this. She denied the physical facts. She lied on the stand, and that was perjurious, and clearly under the case law that is obstruction of justice, and the Court must assess obstruction of justice penalty in the guidelines.
>
> . . . .
>
> ... Her testimony, could have, number one, not have been more false. But number, two, could not have been more material, when she gets up and denies any knowledge of the events and ... absolutely denies what the other witnesses have said happened. I mean, she did not even have any discussion with the Ferrers about the route across the United States. She denied giving them the map. She denied giving them the list of check points that they were supposed to check in on, if the Court will recall. I can't think of any clearer case for an assessment for obstruction.

After listening to both the government and Ledezma's counsel, the district court in-

creased Ledezma's offense level by two levels for obstruction of justice:

I believe that the record in this case, following a verdict of guilty by the jury, requires that I find that the defendant perjured herself on material matters at the time that she testified in her defense. I do not find that any additional efforts required the government, as a result of that perjury.

I too tend to think that you would have put that whole case on regardless of whether she might or might not testify— regardless of the way she did testify. But I do think it was perjury. I do think it was material, and I do think that under the law of the Sixth Circuit, I am required to assess an additional two points for obstruction of justice in light of those findings. There are arguments to be made, such as you have mentioned by the Third Circuit, that have reason behind them. But there are arguments to be made the other way and the Sixth Circuit seems to have gone the other way. Therefore, I am going to add two points in the computation for obstruction of justice.

Ledezma argues that the district court's statement is not specific enough, particularly in light of our decision in *United States v. Clark,* 982 F.2d 965 (6th Cir.1993). In *Clark,* we held that when a district court assigns points for obstruction of justice, it "should identify specifically which statements or actions by a defendant constitute an obstruction of justice." *Id.* at 970.

It is evident from the record that the district court made a finding that Ledezma perjured herself. While the district court did not identify specific statements as untruthful, the colloquy between the court and counsel did identify which statements the government claimed were untruthful. Similarly, in *Clark* this court upheld a sentence enhancement for obstruction of justice even though "the court did not itself repeat the statements it found to be untruthful." *Id.* As in *Clark,* the record in this case reveals that the court had in mind the statements by Ledezma that had just been referenced by government counsel. Thus, because we can determine from the context of the district

court's findings which statements it thought were perjurious, we find no clear error and affirm the enhancement of Ledezma's sentence for obstruction of justice.

■ Next, Ledezma argues that the district court clearly erred in enhancing her sentence based on her role as a manager or supervisor. The sentencing guidelines mandate that a sentencing court increase a defendant's offense level by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive...." U.S.S.G. § 3B1.1(b). The government bears the burden of establishing the factors supporting the enhancement by a preponderance of the evidence. *United States v. Gibson,* 985 F.2d 860, 866 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 2981, 125 L.Ed.2d 678 (1993).

Ledezma contends that there was no evidence that she exercised authority in the organization. She claims that at most she was a go-between. The district court specifically found that Ledezma was involved in giving instructions to the Ferrer brothers and took an active role in directing the delivery of the cocaine. This finding is entirely consistent with the evidence presented at trial. The district court's determination that a defendant played an aggravating role under section 3B1.1 is " 'heavily dependent on the facts,' " and we review such enhancements for clear error. *United States v. Okayfor,* 996 F.2d 116, 122 (6th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993) (citation omitted). We can find no clear error, and accordingly, we affirm the enhancement of Ledezma's sentence for her role as a manager or supervisor.

### 2. Zajac

■ Zajac argues that the district court clearly erred in enhancing his sentence for obstruction of justice because the court failed to make a specific finding of perjury. As we just stated, under the sentencing guidelines, a sentencing judge may enhance a defendant's offense level by two points for obstruction of justice, which includes perjury. U.S.S.G. § 3C1.1, comment. (n.3(b)). The

sentencing judge, however, must make a specific finding that the defendant lied, *United States v. Burnette*, 981 F.2d 874, 879 (6th Cir.1992), and the defendant's lie must be intentional and material:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621. A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory.

*United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). In this case, Zajac testified that he was not involved in his codefendants' cocaine business. He further testified that he did not remember paying Ferrer off in the restaurant parking lot, and he did not remember helping Castellano and Rios remove the cocaine from the house.

At Zajac's sentencing hearing, the government recounted for the court Zajac's allegedly false testimony:

> Specifically he denied moving two hundred and forty-four kilograms of cocaine from the house into that truck, which he assisted in doing. He denied meeting Mr. Ferrer and paying him money. We had very explicit testimony on that, including the observation of an FBI agent that was observing that meeting, that saw Mr. Ferrer go to Mr. Zajac's car, which he had driven up to that bar, retrieve an envelope that contained—I don't know the amount, I think it was three thousand dollars—which the FBI agent later retrieved from Mr. Ferrer.

In deciding to enhance Zajac's sentence for obstruction of justice, the district court stated:

> The jury's verdict in this case indicates that Mr. Zajac's testimony was untruthful. I, myself, conclude that his testimony was untruthful. But I will say this for the record, and for purposes of your appeal. The testimony in Mr. Zajac's case was the presentation of two different versions of fact. . . .
>
>  . . . .
>
>  . . . They are not so overwhelmingly obviously false or true that you could just say that this is clearly perjury, and this is clearly not perjury.
>
> But on the whole, having listened to the trial, I conclude that Mr. Zajac's testimony was untruthful and did constitute perjury.

In *Dunnigan*, the Court held that "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice." *Id.* at ——, 113 S.Ct. at 1117; *see also Clark*, 982 F.2d at 969. While the district court made an "independent finding" of perjury, it did not identify the perjurious testimony, and indeed declared that it was unable to "say that this is clearly perjury, and this is clearly not perjury." Thus, we are left to review a finding of perjury without reference to any particular testimony.

Unless, by its findings, a trial court identifies the testimony it finds perjurious either explicitly or by reference to its context, we are unable to discharge our appellate responsibility to determine whether the court's findings are clearly erroneous. *See Clark*, 982 F.2d at 969. In view of the district court's inadequate findings on the issue of perjury,[1] we must reverse Zajac's enhancement for obstruction of justice, vacate the sentence, and remand for resentencing.

■ Next, Zajac argues that the district court erred in sentencing him based on 577 kilograms of cocaine.[2] Zajac maintains that he should only have been sentenced for the

---

**1.** Relying on *United States v. Colletti*, 984 F.2d 1339 (3d Cir.1992), Zajac argues that a finding of obstruction of justice requires a showing that the defendant's testimony required the government to put forth additional effort in its prosecution. We have never adopted such a rule, and we decline to do so here.

**2.** Apparently because of a mathematical error, Zajac's sentence was based on 577 kilograms of cocaine instead of 595 kilograms (the sum of 244 and 351). The error, however, is of no consequence since it does not affect Zajac's offense level.

244 kilograms he helped remove from the house. He contends that he did not know about the 351 kilograms seized in the van in Memphis. But, of course, it was Zajac who paid and thanked Robert Ferrer for delivering the van. The amount of drugs involved for sentencing purposes need only be proved by a preponderance of the evidence, *United States v. Moreno,* 899 F.2d 465, 473 (6th Cir.1990), and we think, under the guidelines, Zajac's association with the delivery of the van was sufficient grounds for holding him responsible for the drugs involved in that transaction. According to the guidelines, a defendant is accountable for all quantities of drugs with which he was directly involved and, in the case of joint criminal activity, all reasonably foreseeable quantities. U.S.S.G. § 1B1.3, comment. (n.2). The fact that Zajac did not possess the cocaine at the time of his arrest is irrelevant for sentencing purposes. *See Gibson,* 985 F.2d at 863–64. Therefore, we conclude that the district court did not clearly err in basing Zajac's sentence on 577 kilograms of cocaine.

■ Finally, Zajac argues that the district court clearly erred in denying him a four level reduction for being a "minimal participant." Under section 3B1.2 of the sentencing guidelines, a sentencing court may reduce a defendant's offense level by four levels if the defendant was a minimal participant, and two levels if the defendant was a minor participant. If the defendant's actions fall somewhere in between, the court may grant a three level reduction, U.S.S.G. § 3B1.2, and that is what the court did here.

The commentary to the sentencing guidelines limits the minimal participant reduction to:

> a   defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

*Id.* at comment. (n.1). The commentary also explains that this downward adjustment for a

minimal participant should be used infrequently. *Id.* at (n.2).

Nothing in the record indicates that Zajac lacked knowledge or understanding of the enterprise. The evidence indicates that he helped load 244 kilograms of cocaine, and that he paid Robert Ferrer for delivering a shipment of cocaine. Therefore, we conclude that the district court's three level reduction was not clearly erroneous.

### III.

For the foregoing reasons, we **AFFIRM** Ledezma's conviction and sentence in all respects. We **AFFIRM** Zajac's conviction for conspiracy, **REVERSE** his conviction for aiding and abetting, **REVERSE** his sentence enhancement for obstruction of justice, **AFFIRM** all other aspects of his sentence, and **REMAND** for resentencing.