73 F.3d 363
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose MEJORADO-SOTO, Defendant-Appellant.
 No. 94-2404.
 United States Court of Appeals, Sixth Circuit.
 Dec. 27, 1995.
 
 Before: CONTIE, NELSON, and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant is appealing from his conviction and sentence for conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and possession with intent to distribute, and aiding and abetting in possession with intent to distribute marijuana in violation of Sec. 841(a)(1) and 18 U.S.C. Sec. (2). Defendant was indicted on April 13, 1994, and went to trial on August 15, 1994. On August 18, 1994, the jury returned guilty verdicts as to both charges.
 
 I.
 
 2
 The conspiracy in which defendant was charged involved the following. On March 3, 1994, a co-conspirator, Tom Syring, was arrested after a confidential informant gave the police officers a tip that he was selling marijuana. Syring then turned state's witness and the police executed a search warrant at Ashley Groom's apartment and at an apartment on Adams Street where they found defendant with two people, Jessie Arrieta and Jose Vasquez. From further information provided by Syring, the officers located a car in a garage that was filled with marijuana.
 
 
 3
 At trial, Ashley Grooms, in whose apartment marijuana was found, and Syring testified on behalf of the government. They described how they became involved in a conspiracy to distribute marijuana. Syring and Grooms first dealt with Jesse Arrieta, who had come from Mexico to sell drugs in Bay City. After defendant arrived, Ashley Grooms, whose apartment was used extensively in the operation, believed he was the leader of the conspiracy, testifying that defendant invited her to travel with him and told her that he was the boss of Jesse Arrieta, who imported marijuana in a white Mustang from Mexico, had the car driven to Bay City, Michigan, and then used local residents to distribute the marijuana in Bay City. She also testified that when they divided the money, defendant got the most money. She testified that although she could not understand Spanish well, it appeared to her that defendant gave instructions to Jesse who gave instructions to Luis, another co-conspirator.
 
 
 4
 From the searches that were executed, the following items were found to support Syring's and Grooms' contention that the drugs had been imported from Mexico. At the Adams Street address the police found defendant's billfold which contained the address in Texas to which the Mustang was registered. The agents also found a red notebook, which Grooms identified as belonging to defendant. The notebook contained names and telephone numbers and notations associated with drug records.
 
 
 5
 Syring directed authorities to a garage where the Mustang that had imported the drugs was hidden. In the glove compartment, the officers found a Texas title application receipt and an insurance certificate for the Mustang which listed the owner as Monica Belin Morones (Arrieta's girlfriend) with an address of 1001 Atwood, El Paso, Texas. They also found a February 18, 1994 bill of sale for the Mustang made out to Monica Belin Morones, but with her Michigan address. Information on vehicles crossing from Mexico into El Paso, Texas recorded that on February 21, 1994 a vehicle with Texas license number MDT 98T crossed into Texas. This number matched the Mustang's license number, but with one letter transposed. Telephone bills from Grooms' apartment, which recorded calls made by defendant and his co-conspirators, reflected calls to Mexico and El Paso, Texas during this time frame. The officers also found 61-72 pounds of marijuana hidden in various compartments, such as the wheel wells of the Mustang.
 
 
 6
 After the jury convicted defendant, the district court sentenced defendant on November 18, 1994, to concurrent terms of 108 months imprisonment on each count of the indictment, plus concurrent terms of six years supervised release, and a special condition that he be subject to deportation immediately upon his release from prison. Defendant now appeals from this sentence.
 
 II.
 
 7
 We must first decide whether defendant is entitled to a new trial because of prosecutorial misconduct. Defendant argues that two remarks made by the prosecutor in his rebuttal closing argument constituted prosecutorial misconduct, which require that defendant be given a new trial.
 
 
 8
 The first remark which defendant objects to is as follows:
 
 
 9
 They're up here from wherever they were from ... selling marijuana on the streets of Bay City to people who live in Bay City and Saginaw and the surrounding area.... They're getting these young people who live in the area to do their work for them because they want to insulate themselves from the police.
 
 
 10
 Defendant contends that this remark constitutes a "war against crime" argument and a "civic duty" argument, in which a prosecutor takes a case in which there is slight evidence and indicates that the jury must find the defendant guilty in order to further the war against crime and as a matter of civic duty. Defendant argues that this remark implies that the prosecutor was suggesting to the jury that defendant would be a personal threat to the jurors or the jurors' families. Defendant argues this type of remark is impermissible as found in Campbell v. Kincheloe, 829 F.2d 1453, 1457-59 (9th Cir.1987), cert. denied, 488 U.S. 948 (1988).
 
 
 11
 We disagree that the prosecutor's remark constitutes a "civic duty" or "war against crime" comment that is not proper. Instead, the comment was directly related to the United States' theory of the case and to a rebuttal of defendant's theory. The prosecutor's rebuttal must be viewed in context as a response to defendant's closing argument, in which defense counsel argued that the evidence of Mexican and Texan connections was not sufficient. The defense argued that the credibility of the government witnesses, Grooms and Syring, was unbelievable and that they were the only defendants directly involved in the conspiracy. In response to this argument, the United States argued that these witnesses' testimony was corroborated by evidence which demonstrated defendant's connection to El Paso, Texas, and Mexico, the same alleged locations from which the marijuana was transported to Bay City. The government then explained the modus operandi of defendant and his co-conspirators--that they would come into an area and use local people to do their work so they would be insulated from law enforcement scrutiny.
 
 
 12
 The district court found that the prosecutor's remarks were not a "civic duty" argument, stating:
 
 
 13
 A civic duty argument encourages the jury to convict a defendant based upon principles of protection of the community and encourages them to ignore the evidence in the case. Though the evidence may be weak, it is their duty to protect their homes and wives and daughters and things such as that. That was not this argument. This argument was based upon evidence, sufficiently I think, to allow it to be called a fair comment.
 
 
 14
 We agree with this analysis of the district court. The prosecutor was summarizing the evidence and commenting upon its significance. United States v. Drake, 885 F.2d 323, 324 (6th Cir.1989), cert. denied, 493 U.S. 1033 (1990).
 
 
 15
 The second prosecutorial remark to which defendant objects is as follows:
 
 
 16
 Was there any evidence in this case--first of all, there is no question Jesse Arrieta was here. Certainly there's some evidence that somebody by the name of Luie was here from someplace else, and there was evidence certainly that the defendant was here. Why were they here? What were they doing? Is there any evidence to suggest that they were here to work? There was evidence that they weren't working. Is there any evidence to suggest that they were visiting relatives? There was no indication that they visited relatives, everybody testified that they hung around Bay City. And is there anything to suggest that they would be here on a vacation? Would people from Mexico come to Bay City in the three coldest months we had in years?
 
 
 17
 Defendant argues that the prosecutor was commenting on defendant's failure to testify. Defendant argues that the prosecutor was telling the jury that they need not worry about the lack of evidence against defendant because he had no explanation of why he, a Mexican citizen, was in Bay City in the winter during the coldest three months of the year and that he did not present any evidence that he was visiting relatives.
 
 
 18
 The United States argues that the prosecutor was asking rhetorical questions, and then providing answers supported by the evidence. The United States argues that the evidence corroborates the prosecutor's suggestion that defendant and his friends did not work, that they hung around Bay City all day in Grooms' apartment, and that it was common sense that they would not be there for a vacation in the winter. The United States argues that this circumstantial evidence is consistent with the government's theory that defendant was in town to sell marijuana.
 
 
 19
 We do not agree with defendant that these remarks were an attempt to shift the burden of proof to defendant to prove why he was there. Furthermore, the questions were ambiguous and subject to more than one interpretation. In such an instance, a court should not lightly conclude that a jury would infer the most damaging interpretation. Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974).
 
 
 20
 In the present case, the evidence against defendant was strong. There was testimonial evidence of Grooms and Syring, which was independently corroborated by the physical evidence--the marijuana found in the Mustang car, the telephone records indicating calls to Mexico, and defendant's drug ledger. The prosecutor's comments were based on this evidence and did not constitute prosecutorial misconduct. For these reasons, district court is affirmed on this issue.
 
 III.
 
 21
 We must next decide whether the district court erred in giving defendant a sentencing enhancement for playing an aggravating role in the marijuana conspiracy by acting as a manager or supervisor.
 
 
 22
 United States Sentencing Guideline Sec. 3B1.1(b) governs enhancements based on one's role in the offense. There are four levels of enhancements for playing an aggravating role in the offense. In the present case, defendant received the median of these aggravating role enhancements, a three-level enhancement, for being a manager or supervisor of a criminal activity that involves five or more participants or is otherwise extensive. Defendant was not found to be the organizer or leader of the conspiracy for which he could have been given a four-level enhancement.
 
 
 23
 The district court gave defendant the three-level enhancement, instead, based on an analysis of the evidence. He pointed out that two of the books, a personal planner and a spiral notebook, which Ashley Grooms identified as belonging to defendant, were drug ledgers which defendant kept. The court then determined that defendant should receive an enhancement as a manager or supervisor, stating:
 
 
 24
 All right. It is, I think consistent with the defendant's behavior that he was, from all of this evidence, someone who claimed a control over marijuana. I think it is clear that he received proceeds from the sale of his marijuana.
 
 
 25
 I think it's a reasonable inference that Ashley Grooms made that it appeared to her to put him, that is the defendant, in a position of giving some direction from time to time in Spanish to other individuals here, and it seems to me that he was the one who was accounting for the various transactions, the costs, the profits and the like, the drug records attributable to him. I think that all bears this out.... Certainly, however, the evidence is satisfactory to show that he was doing supervisory duties and that there were more than five individuals involved down the line within which--within the scope of whose duties he was exercising some supervisory role over.
 
 
 26
 For the first time on appeal, defendant argues that the district court did not make a specific finding as to which five people he supervised. However, this court held in United States v. Richardson, 949 F.2d 851, 859 (6th Cir.1991), that it is not necessary for a court to recite specific facts to support its findings in regard to this guideline if the sentencing judge also presided over the trial. Moreover, the evidence in the record supports that there were more than five people involved in this conspiracy--Syring, Grooms, Krawczak, Arrieta, and Vasquez. Also, at sentencing in response to an inquiry from the district court, defendant conceded that the essence of his objection to this enhancement was that there was no evidence that he led anyone, not that he did not lead five people. Also, in his brief, defendant concedes that the conspiracy included at least eight individuals. Furthermore, contrary to defendant's contention, a manager need not supervise each of the other participants. United States v. Dean, 969 F.2d 187, 197 (6th Cir.1992), cert. denied, 113 S.Ct. 1852 (1993).
 
 
 27
 The district court's factual findings in regard to U.S.S.G. Sec. 3B1.1(b) are reversible for clear error only. United States v. Williams, 962 F.2d 1218, 1226 (6th Cir.), cert. denied, 113 S.Ct. 264 (1992). Given the evidence against defendant--his indication to Grooms that he was "the boss," who took most of the money when it was divided and and kept the drug ledgers, we believe there is sufficient evidence to support the district court's factual finding that defendant was a supervisor. United States v. Castro, 908 F.2d 85, 90 (6th Cir.1990). The district court did not commit clear error and is therefore affirmed on this issue.
 
 
 28
 The opinion of the district court is hereby AFFIRMED.
 
 
 29
 RYAN, Judge, dissenting in part.
 
 
 30
 Although I join in part II. of the majority opinion, I am persuaded that the district court clearly erred in giving the defendant a three-level enhancement for his role in the offense. To be sure, I agree with the majority opinion that there is no merit to the defendant's contention that the district court erred in failing to make a specific finding as to which five people he supervised. Nonetheless, it is my view that the government failed to prove by a preponderance that the defendant was a manager or supervisor at all. Accordingly, I must respectfully dissent from part III.
 
 A.
 
 31
 Unfortunately, a review of all the evidence is necessary in order to know with certainty whether the government proved that Mejorado was a manager or supervisor. In the fall of 1993, Thomas Syring, a resident of Bay City, Michigan, made the acquaintance of Jesse Arrieta. Within two weeks of meeting Arrieta, Syring, at Arrieta's instance, began buying marijuana from him. Syring always bought the marijuana directly from Arrieta, and always paid Arrieta directly, "to make sure he got it."
 
 
 32
 In December, Arrieta introduced Syring to Luis Madrigal, whom Arrieta had recently brought to Michigan from Chicago, Illinois. Madrigal's function was to "r[u]n errands for [Arrieta] all the time," such as "[t]aking pot to people and collecting money." Syring, too, ran similar errands for Arrieta. Approximately once or twice a week, people would call Arrieta, and Arrieta would direct Syring to deliver marijuana to them. On other occasions, Arrieta gave Syring money, and instructed him to obtain money orders and send them to specified addresses. A friend of Syring, Ronald Krawczak, was also involved in purchasing marijuana during this period. Krawczak bought marijuana from Syring, which Syring in turn obtained from Arrieta, about five or six times between November 1993 and March 1994.
 
 
 33
 In December or January, Syring met the defendant, Jose Mejorado, at the apartment of Bay City resident Ashley Grooms. Mejorado had just arrived in town when Syring met him, and was introduced as another friend of Arrieta. Mejorado lived in Grooms's apartment for about four days in mid-January, and later moved in with Arrieta. According to Grooms, she was coerced during this period into allowing Arrieta to sell marijuana from her house. Unidentified people "would come to [her] house and either [Arrieta], [Madrigal] or somebody would take them into my bedroom and then they would come out and they would leave." Grooms claimed that Arrieta and Madrigal, although not Mejorado, threatened her to make her cooperate in their activities.
 
 
 34
 One day in late February, Syring was summoned by Arrieta to go with him to visit Arrieta's girlfriend, Monica Belin, in Flint, Michigan. Arrieta, Madrigal, and Mejorado picked Syring up early one Sunday morning, and arrived at Belin's parents' house that afternoon. Belin opened the garage, revealing a white Ford Mustang without a license plate. Madrigal took a Texas license plate out of the car they had driven in, and put it on the Mustang. They all then returned to Bay City, with Madrigal and Syring driving the Mustang. During the ride, Madrigal told Syring that the car had marijuana in it.
 
 
 35
 Syring allowed the car to be stored in his grandmother's garage for one night, but then informed Arrieta that it had to be moved. Arrieta and Syring met with Ron Krawczak, and Arrieta asked if they could store the car in his garage. Krawczak agreed. After moving the car to Krawczak's garage, Madrigal began taking it apart and removing the marijuana. It was shortly after this incident, as described in the majority opinion, that the various actors were arrested.
 
 
 36
 At trial, Syring, Krawczak, and Grooms testified for the prosecution. When questioned about Mejorado's involvement in the conspiracy, both Syring and Krawczak testified that he was a marginal figure. Syring testified that he never obtained marijuana from Mejorado, although he saw him once or twice a week from the time he met him through March. Instead, he always purchased it from Arrieta, whom he saw more often. Syring never saw Arrieta and Mejorado exchange money and, in fact, never saw Mejorado deal marijuana at all. In sum, in Syring's view, "[Mejorado] was just a friend of [Arrieta's] like a tag around, someone--just a friend ... [without] too much involvement."
 
 
 37
 Similarly, Krawczak recalled that on the five occasions when he saw Mejorado, he usually "would just sit on the couch or just--he usually just sat down, he didn't really say much or wasn't involved in the conversations like [Madrigal] and [Arrieta] were." Moreover, he never saw him sell or even smoke any marijuana, and never saw him handling large amounts of money.
 
 
 38
 Grooms also testified that ninety percent of the marijuana trafficking was performed by Arrieta and Madrigal, not Mejorado. Grooms testified, though, that it was her belief that in dividing up proceeds, "[Mejorado] would usually get most of the money." Grooms also testified that Mejorado habitually gave unspecified "instructions" to Arrieta, who in turn gave them to Madrigal. And Grooms claimed that Mejorado told her on one occasion that he was Arrieta's boss. Finally, Grooms testified that the handwriting in one book, identified by a law enforcement officer to be a "drug ledger," was Mejorado's; she did not, however, as the majority opinion asserts, actually identify the book as belonging to Mejorado. At the time of sentencing, the district court concluded that another book had the same handwriting, and appeared also to be a drug ledger, and concluded that both books belonged to the defendant.
 
 
 39
 At sentencing, Mejorado was assigned a base offense level of 24, for distribution of 80 to 100 kilograms of marijuana, pursuant to U.S.S.G. Secs. 2D1.1(a)(3), 2D1.1(c)(10). Arguing that the base offense level should be increased four levels pursuant to U.S.S.G. Sec. 3B1.1(a), the government theorized, both at sentencing and here on appeal, that Mejorado was the leader or organizer of the conspiracy. It reasoned, imaginatively to be sure, that the very lack of apparent extensive involvement by Mejorado was simply an indication that he was so powerful that he naturally would not involve himself with the minutiae of the operation--a rationale of questionable validity. Although the district court generally adopted the findings in the presentence report, it rejected a recommendation for a four-point increase. It instead applied the three-level increase at issue here, pursuant to U.S.S.G. Sec. 3B1.1(b), believing "that the defendant was more of a manager or supervisor than a leader or organizer." As the majority opinion sets forth, the district court relied entirely on two categories of evidence for this conclusion: the testimony of Ashley Grooms, and the existence of the drug ledgers in the defendant's handwriting. As the district court itself acknowledged, however, it believed that "the evidence is indirect, ... the evidence is not utterly clear as to the defendant's organizational responsibilities here."
 
 B.
 
 40
 It is well-established that the sentencing court's determination that the defendant played a leadership role in the offense under U.S.S.G. Sec. 3B1.1 is a determination that is "heavily dependent on the facts," and reviewed by this court for clear error. United States v. Ledezma, 26 F.3d 636, 644 (6th Cir.), cert. denied, 115 S.Ct. 349 (1994) (internal quotation marks omitted) (citation omitted). The government has the burden of proving by a preponderance the facts necessary to the district court's finding as to the defendant's role in the offense. United States v. Gibson, 985 F.2d 860, 866 (6th Cir.), cert. denied, 113 S.Ct. 2981 (1993).
 
 C.
 
 41
 U.S.S.G. Sec. 3B1.1 provides that if a defendant was a "manager or supervisor," a lesser status than an "organizer or leader," of extensive criminal activity, the defendant's offense level should be increased by three levels. The Sentencing Commission has advised the courts of a number of factors that may be considered in determining whether a defendant played a leadership role for sentencing purposes:
 
 
 42
 [T]he exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 43
 United States v. Alexander, 59 F.3d 36, 38 (6th Cir.1995) (quoting U.S.S.G. Sec. 3B1.1, comment. (n. 4)). It is not, however, necessary that the court find evidence of each leadership factor in order to assess the enhancement. Id.
 
 
 44
 As already suggested, the evidence relied on by the district court in assigning Mejorado a three-level increase, and in turn relied on by the majority in affirming the district court, falls into two categories: 1) the testimony of Ashley Grooms that, for various reasons, she believed the defendant was the leader of the conspiracy; and 2) the existence of what appear to be drug ledgers in the handwriting of Mejorado. In my view, this evidence, when viewed in the context of the evidence as a whole, is simply insufficient to amount to proof by a preponderance of Mejorado's role as a manager or supervisor.
 
 
 45
 First, with the exception of Grooms's testimony, all of the evidence was consistent that Mejorado's role was small. The two other government witnesses were firm in their characterization of the defendant as a fringe actor, and no witness, including Grooms, testified regarding any incidents that would objectively suggest a leadership role. Instead, the evidence strongly suggests that Arrieta alone was in control; every incident described by the witnesses discussed Arrieta's receiving the money, and Arrieta's giving the instructions. Moreover, the evidence was undisputed that Mejorado did not appear in Bay City until December or January, several months after the inception of the conspiracy. Nonetheless, the government offered no evidence to explain who had been in charge during that extended period of Mejorado's absence, or to suggest that Mejorado had been exerting control from a distance. Instead, it appears from the evidence that Mejorado, like Madrigal, was summoned by Arrieta to Michigan.
 
 
 46
 While there are three pieces of testimony by Grooms that the majority has pointed to as supporting a determination of Mejorado's leadership role, none of these, on close examination, provides a reasonable basis for such a conclusion. First, although Mejorado allegedly told Grooms that he was Arrieta's boss, this apparently damning representation becomes of minimal significance when one considers that it took place during what appears to have been a romantic overture. During the conversation, not only did the defendant claim to be the boss, but he told her that he wanted to "travel with [her] to places" and that he "would buy things, buy [her] presents and stuff." These surrounding circumstances, then, strongly suggest that the statement could best be characterized as mere puffing on the part of Mejorado, an attempt to impress Grooms. Next, Grooms testified that she thought Mejorado received more money than Arrieta when money was divided, but her testimony was vague and indefinite; she testified as to her unsupported conclusion in this regard, and provided no clue as to how she reached such a conclusion, and recounted no incidents where such a division actually occurred. Third, Grooms testified that Mejorado usually gave unspecified "instructions" to Arrieta, who in turn gave them to Madrigal--and yet Grooms also acknowledged that she did not speak Spanish, and Mejorado could barely speak English. Accordingly, she was unable to detail any particular instruction that Mejorado might have given, or to explain how she knew his words were instructions. And importantly, in every single one of her accounts of various events during the course of the conspiracy, it was Arrieta, not Mejorado, who gave the instructions. Thus, Grooms's summary conclusion that Mejorado was the leader is simply contradicted by the details of the rest of her testimony, in which she discussed Arrieta's ordering and directing of all aspects of the activity. In my view, therefore, her testimony with respect to Mejorado's role can be accorded little, if any, weight.
 
 
 47
 Remaining, then, are the drug ledgers in Mejorado's handwriting. It is unclear to me why Mejorado's functioning as an accountant for the conspiracy should be equated with evidence that he was the manager or supervisor. That is not a factor that the Sentencing Commission has pointed to as significant, and I am unaware of a single case where that factor was treated as to support a three-level enhancement.
 
 
 48
 In sum, a review makes clear that the government produced no evidence as to the vast majority of the factors delineated by the Sentencing Commission, and only the weakest of evidence with regard to the remainder. There was no evidence that Mejorado exercised any decision making authority; had anything but a minimal, fringe role in the marijuana distribution; recruited accomplices; or participated in planning or organizing the marijuana distribution. The only evidence that Mejorado claimed a right to a larger share of the fruits of the crime is Grooms's conclusory assertions that he received more money, and the only evidence that he exercised any control over others is, again, Grooms's dubious claim that he gave instructions to Arrieta. While it is clearly not necessary that the government produce evidence as to each of the factors listed by the Sentencing Commission, it is equally plain that something more should be required than was present here.
 
 
 49
 I would conclude, therefore, that the district court clearly erred in basing a finding that Mejorado was a manager or supervisor on the evidence presented, which it itself acknowledged to be "indirect" and "not utterly clear." I, therefore, respectfully dissent from part III. of the majority opinion, and would reverse the sentence and remand for further proceedings. I concur, however, in the balance of the majority opinion.