**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 12a0066n.06

No. 10-1803

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED**<br>**Jan 19, 2012**<br>LEONARD GREEN, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| JUAN CADAVID-YEPES | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| _____ | ) | |

Before: MERRITT and MOORE, Circuit Judges; and MAYS, District Judge.[*]

**KAREN NELSON MOORE, Circuit Judge.** Juan Cadavid-Yepes ("Cadavid") appeals the judgment entered against him and subsequent sentence based on his plea of guilty to one count of importation of a listed chemical in violation of 21 U.S.C. § 960(d)(1) and 18 U.S.C. § 2. Cadavid was extradited from Colombia for his role in shipping samples of chemicals used in the manufacture of methamphetamine hidden in the ink cartridges of two pens. Cadavid argues that his plea should not have been accepted as it lacked a sufficient factual basis and that his subsequent sentence was procedurally unreasonable because it was based on an improperly calculated drug quantity. Cadavid's plea agreement contained an appeal waiver provision that would otherwise preclude his procedural reasonableness challenge; therefore, he also argues that this waiver was invalid.

_____

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

## I.  BACKGROUND

Cadavid was first charged in a sealed indictment in August 2006 for three controlled-substance counts.  At the time the initial indictment was filed, Cadavid was in Colombia serving an unrelated prison sentence and needed to be extradited.  On December 4, 2008, he made his first appearance in the Eastern District of Michigan, and a superseding indictment was unsealed charging him with (1) conspiracy to manufacture a controlled substance in violation of 21 U.S.C. § 846, specifically 500 grams or more of a substance containing methamphetamine, (2) conspiracy to possess a listed chemical with the intent to manufacture a controlled substance in violation of 21 U.S.C. § 846, specifically ephedrine and phenylpropanolamine ("PPA"), both list I chemicals, and (3) importation of listed chemicals in violation of 21 U.S.C. § 960(d)(1) and 18 U.S.C. § 2, specifically ephedrine and PPA.  R. 8 (Superseding Indictment).

On September 9, 2009, Cadavid pleaded guilty to Count 3 pursuant to a written plea agreement prepared only in English, not in Spanish.  Cadavid is a native Spanish-speaker and does not speak English.  He communicated with counsel and the court via an interpreter.  The plea agreement stated that Cadavid sent a package from Colombia of two ballpoint pens, each containing approximately one gram of a listed chemical hidden in its ink cartridge, which arrived in Detroit, Michigan, on May 23, 2006.  R. 44 (Plea Agreement at 2).  The samples were sent to a confidential DEA source that Cadavid believed represented drug traffickers who wanted the chemicals for the purpose of manufacturing methamphetamine.  *Id.*  Toxicology reports revealed one pen contained ephedrine and one pen contained PPA.  R. 46 (Plea Hr'g Tr. at 14).

At his plea colloquy, Cadavid maintained that he did not send the package; rather, he arranged for someone else to send it. *Id.* at 15. He also did not know the exact chemicals in the pens, but accepted the toxicology findings. *Id.* at 14. He maintained that he did not know until he was indicted that it was illegal to ship these chemicals to the United States, but he did not deny his involvement in sending them. Although the indictment was re-read, he was never asked about whether the purpose of sending the drugs was to aid in the manufacture of controlled substances or about any future contemplated transactions. The district court accepted Cadavid's plea and took the Rule 11 "under advisement." *Id.* at 16.

The plea agreement did not stipulate to an appropriate sentencing guidelines range, as the parties disputed Cadavid's role in the offense and the drug quantity involved. R. 44 (Plea Agreement at 3-4). Following the plea hearing, the probation department issued its Pre-Sentence Report ("PSR") recommending that Cadavid be sentenced in accordance with the government's range, which included a base offense level of thirty-eight due to a drug quantity of twenty-five kilograms. The defendant objected to the report on this basis as well as others, arguing that the proper quantity was the two grams recovered in the pens sent to the United States.

The district court held an evidentiary hearing prior to sentencing, during which the government called the DEA agent overseeing Cadavid's investigation. DEA Agent Lance Gibson ("Agent Gibson") testified with respect to Cadavid's communications with the informant. R. 68 (Sent. Hr'g Tr. Part 1 at 23-37). Agent Gibson offered several statements by the confidential informant that he had approached Cadavid as a representative of drug traffickers in Michigan

interested in purchasing large quantities of ephedrine and PPA for the purposes of manufacturing methamphetamine. *Id.* at 20, 24. Agent Gibson discussed several emails the government obtained between Cadavid and the informant in which they used code words for ephedrine and the sale of drums. *Id.* at 30-37. Agent Gibson was also asked about Edgar Bohorquez, the defendant's supplier of the chemical samples, who was arrested following the completed sale in Colombia of a twenty-five kilogram drum of PPA to the same confidential informant in September 2006. *Id.* at 63. The informant was not made available to testify, and Cadavid's attorney made numerous objections to the lack of sufficient indicia of reliability with respect to Agent Gibson's recital of the informant's statements unsupported by audio or documentary evidence.[1] The government intended to call Edgar Bohorquez but decided not to do so at the last minute. The defense called no witnesses, choosing instead to make arguments pointing out the speculative nature of the government's evidence that purportedly linked Cadavid to the sale of a drum of listed chemicals.

Following arguments from both sides, the district court found that a preponderance of the evidence demonstrated the defendant was responsible for twenty-five kilograms, the amount Cadavid and others jointly endeavored to send to the United States. R. 61 (Sent. Hr'g Tr. Part A at 21-22). Before sentencing, Cadavid allocuted and offered further explanation of his understanding of the transactions. He did not deny arranging to send the pens to the United States or that the samples were to precede a subsequent purchase. Rather, he believed the transaction he was arranging would

---

[1]Additional details regarding Agent Gibson's testimony and the evidence offered by the government in support of using twenty-five kilograms as the correct drug quantity are discussed more fully later in this opinion. *See infra*, Part III.

occur in Colombia or Mexico and would be "from company to company legally." *Id.* at 40-46. He

argued that the confidential informant was the one who insisted on talking in code and inflating the

amount. *Id.* at 39, 44. Even when he was told to send the samples to the United States instead of

Mexico, as was originally the plan, he never believed that any other part of the transaction would

take place in the United States. *Id.* at 45.

The district court then sentenced Cadavid to ninety-seven months' imprisonment following

reductions for his minor participation in the offense and for acceptance of responsibility. The district

court declined to vary based on the conditions Cadavid faced in the Colombian prison while awaiting

extradition. Cadavid filed a timely notice of appeal.[2]

## II. APPELLATE WAIVER

Whether a defendant has validly waived his right to appeal is a legal question this court

reviews de novo. *United States v. Jones*, 569 F.3d 569, 571-72 (6th Cir. 2009). A valid appellate

waiver in a plea agreement will be enforced as long as the waiver was made knowingly and

voluntarily. *United States v. Fleming*, 239 F.3d 761, 764 (6th Cir. 2001).

Cadavid's appellate waiver in his plea agreement is less than a model of clarity. It states:

> 6. RIGHT TO APPEAL – If the sentence imposed does not exceed the maximum
> allowed by Part 3 of this agreement, defendant waives any right he has to appeal his
> conviction or sentence. If the sentence imposed is within the guideline range

---

[2]This court initially dismissed Cadavid's appeal following his failure to respond to a motion to dismiss filed by the government on the basis of the appellate waiver in his plea agreement. His appeal was reinstated, however, upon the government's failure to respond to Cadavid's motion for reconsideration, challenging the validity of the plea and the waiver itself.

determined by Paragraph 2B the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

The relevant portion of "Part 3" states:

3.  SENTENCE – The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

(A) Imprisonment – Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the sentence of imprisonment in this case may not exceed the top of the sentencing guideline range recommended by the government as described in Paragraph 2B.

Paragraph 2B states each party's position on the disputed guidelines range. The government recommended a range of 97 to 121 months; the defendant recommended a range of 21 to 27 months. R. 44 (Plea Agreement at 3).

During the plea colloquy, the district court had the following exchange with Cadavid as it relates to his appeal:

THE COURT:  If I sentence you under either parties' [sic] guideline range, then you waive your right to appeal the conviction or sentence.  You understand that?

[CADAVID]:  Yes, Your Honor.

R. 46 (Plea Hr'g Tr. at 12).  At sentencing, the district court again repeated that Cadavid had no right to appeal his sentence because it was within the government's range, and his counsel made no objection.  R. 66 (Sent. Hr'g Tr. Part B at 9).

Cadavid argues that he believed his waiver provision afforded him the right to appeal a sentence in excess of his recommended range of 21-27 months, not just in excess of the government's range.  The government maintains that Cadavid could appeal only sentences outside

of the government's range. Because Cadavid received a sentence at the low end of the government's range, the government argues, he waived his right to appeal.

Generally, we construe ambiguities in plea agreements in favor of the defendant. *Jones*, 569 F.3d at 572. Although Cadavid's argument strains the text, the agreement does not explicitly waive his right to appeal under these circumstances, as it easily could have done. We therefore assume, without deciding, that Cadavid's appellate waiver provision entitles him to appeal his sentence.[3]

## III. RULE 11 FACTUAL BASIS CLAIM

Regardless of whether the appellate waiver is valid, a defendant retains the right to challenge the entry of his guilty plea due to a district court's failure to comply with Federal Rule of Criminal Procedure 11 ("Rule 11"). *In re Acosta*, 480 F.3d 421, 422 (6th Cir. 2007). Cadavid argues that his conviction should be reversed because the district court failed to ensure there was a sufficient factual basis to support his plea under 21 U.S.C. § 960(d)(1). *See* Fed. R. Crim. P. 11(b)(3). Cadavid concedes that his failure to object to the purported violation at his plea colloquy renders his appeal subject to plain-error review. *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). This means that Cadavid must show (1) an error, (2) that is plain, and (3) that affected his substantial rights. *United States v. Lalonde*, 509 F.3d 750, 759 (6th Cir. 2007). "If all three conditions are met,

---

[3]We also decline to decide both the government's argument that this court's prior dismissal precludes the defendant from arguing that the appeal waiver is invalid, Appellee Br. at 15, and Cadavid's arguments relating to counsel's ineffectiveness, even though he denies that he is bringing a claim of ineffective assistance of counsel, Appellant Reply Br. at 2. Cadavid's arguments are best reserved for a motion under 28 U.S.C. § 2255, when the record may be more fully developed as to what exchanges Cadavid had with his attorney before entering the plea.

an appellate court may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or reputation of judicial proceedings." *Id.* (internal quotation marks omitted). When the defendant argues that a Rule 11 violation was plain error, he demonstrates that his substantial rights were affected by showing a reasonable probability that, but for the error, he would not have pleaded guilty. *Dominguez Benitez*, 542 U.S. at 83.

Rule 11(b)(3) requires that, "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." The purpose of this rule is to make sure the defendant actually committed the offense for which he is pleading guilty. *United States v. McCreary-Redd*, 475 F.3d 718, 722 (6th Cir. 2007). In reviewing an appeal based on a violation of Rule 11(b)(3), this court "may examine the entire record, including proceedings that occurred *after* the plea colloquy." *Id.* at 722 n.1 (emphasis in original) (internal quotation marks omitted). The relevant inquiry is whether there is "some evidence" that the defendant committed each element of the offense, not whether there is "strong evidence of actual guilt." *United States v. Mobley*, 618 F.3d 539, 547 (6th Cir. 2010); *see also* Appellant Br. at 30.

Cadavid pleaded guilty to importing listed chemicals to the United States with the intent to manufacture a controlled substance in violation of 21 U.S.C. § 960(d)(1) and 18 U.S.C. § 2. The parties agree that the elements of the offense require the government to establish that Cadavid "(1) knowingly and intentionally; (2) import[ed] into the United States from a place outside of the United States; (3) listed chemicals, that is, ephedrine and [PPA]; (4) with the intent to manufacture a controlled substance." Appellee Br. at 21; *see also* Appellant Br. at 28. Cadavid does not challenge

that he knowingly and intentionally imported listed chemicals; only the fourth element, the specific "intent to manufacture a controlled substance," is in dispute. Cadavid argues that he thought this was a lawful transaction between two companies and did not intend for the samples or any prospective sale to be used in the production of controlled substances. Appellant Br. at 33.

The record clearly establishes sufficient evidence on review for us to conclude that there was a factual basis for Cadavid's plea to the importation offense. The district court at Cadavid's plea hearing read aloud Count 3 to him, which charged him with importing chemicals with the intent to manufacture a controlled substance. R. 46 (Plea Hr'g Tr. at 8); *see McCreary-Redd*, 475 F.3d at 723-24. The signed plea agreement and the PSR also unequivocally set forth the intent to assist in the manufacture of controlled substances.[4] R. 44 (Plea Agreement at 2) ("The defendant had sent the package to a DEA confidential source, who the defendant believed represented drug traffickers in Michigan interested in purchasing large quantities of [the chemicals] for the purpose of manufacturing methamphetamine."); PSR at 6 (detailing defendant's knowledge that chemicals were to be used to manufacture methamphetamine in the United States for subsequent distribution); *see McCreary-Redd*, 475 F.3d at 724. Although the intent to manufacture controlled substances was never discussed further at the plea colloquy, Cadavid's later statement that he did not know his acts constituted a crime does not fatally undermine the factual basis established by the court.

---

[4]Cadavid's argument that these documents should be disregarded because they were not properly explained or read to him by his counsel are arguments that would best be heard on a § 2255 motion raising claims of ineffective assistance of counsel.

Additionally, consideration of the whole record further establishes that the district court had a sufficient factual basis to accept the guilty plea. Even apart from Agent Gibson's statements that the confidential informant told Cadavid that he represented drug traffickers in Michigan, the emails from Cadavid to the informant establish that this was not intended to be a lawful transaction between two companies. Rather, it was intended to supply chemicals for the purposes of manufacturing methamphetamine. Cadavid attempts to blame the confidential informant for the use of code in the emails, but offers no explanation for why he himself would use code if the transaction were a legitimate sale of the chemicals between two companies. The very fact that the samples were shipped hidden in the ink cartridges of ball point pens further undermines Cadavid's position.[5] Cadavid himself in the emails presented by the government at his sentencing hearing references obtaining a "mechanic" from South Africa, which the government argued was code for a chemist to process the chemicals into methamphetamine. Cadavid offers no alternative explanation for what this might mean. He also received an email from the confidential informant indicating that they will "need a good apartment with good location and without seizure problems and with good neighbors."

Nor does Cadavid argue that, but for the asserted error, he would not have pleaded guilty. Instead, he argues that he would not have pleaded guilty if he knew he would be liable for the twenty-five-kilogram drum. Appellant Br. at 33. Based on these arguments and the record below,

---

[5]Cadavid also stated in his allocution that the reason he asked someone else to ship the pens to the United States was because, in his words, "I don't want to get involved in this. I felt kind of that it was illegal." R. 61 (Sent. Tr. Hr'g Part A at 45).

we cannot conclude that the district court committed plain error in determining a factual basis existed for Cadavid's plea to importation with the intent to manufacture a controlled substance.

### IV. PROCEDURAL REASONABLENESS OF SENTENCE CLAIM

If the appellate waiver provision is invalid or inapplicable, Cadavid is entitled to appeal the procedural reasonableness of his sentence. Such claims are reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51-52 (2007). Any factual findings determined by the district court in applying the sentencing guidelines are reviewed for clear error. *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006).

Cadavid argues that his sentence was procedurally unreasonable for three reasons: (1) the district court failed to calculate properly the guidelines when it held him accountable for twenty-five kilograms of chemicals and not two grams; (2) the district court failed to resolve each disputed fact on the record as required under Federal Rule of Criminal Procedure 32; and (3) the district court used clearly erroneous facts and unreliable testimony from Agent Gibson in imposing the sentence. Because the first and the third arguments relate to the same issue—what drug quantity should be used to calculate Cadavid's sentence—we discuss them together.

### A. Quantity of Drugs

The base offense level for a violation of 21 U.S.C. § 960(d)(1) is set by referencing the drug quantity table in U.S.S.G. § 2D1.11(d). Where the amount in the offense is three kilograms or more of either ephedrine or PPA, the base offense level is thirty-eight. Where the amount is at least two

grams but less than four, the base offense level is eighteen.[6]  The district court first must make a finding as to the amount of drugs for which the defendant is "accountable" based on his relevant conduct under U.S.S.G. § 1B1.3.  *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003).  Relevant conduct includes "all quantities of drugs with which [the defendant] was directly involved and, in the case of joint criminal activity, all reasonably foreseeable quantities."  *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir.), *cert. denied*, 513 U.S. 942 (1994).  A district court's findings with respect to drug quantities must be supported by a preponderance of the evidence.  *Gill*, 348 F.3d at 151.  "When the amount of drugs is uncertain, the district court must 'err on the side of caution' and hold the defendant accountable only for that amount that is more likely than not attributable to the defendant."  *Id.*  The district court may, however, consider quantities of drugs not specified in the count of conviction if they were part of the same course of conduct as the offense of conviction.  *Id.* (citing U.S.S.G. § 1B1.3(a)(2)).

At sentencing, the government offered seven pieces of evidence to establish that Cadavid was accountable for the twenty-five-kilogram drum and not just the two one-gram samples that he had sent to the United States:  (1) Agent Gibson's testimony that the confidential informant played the role of a broker who wanted to buy drums of ephedrine; (2) Agent Gibson's testimony that the confidential informant told Cadavid in meetings that he was interested in getting drums of ephedrine or PPA; (3) that Cadavid sent a sample of both chemicals to Detroit, which implied a larger quantity

---

[6]Section 2D1.11(d) n.*(B) instructs the court to aggregate quantities when both ephedrine and PPA are involved.  Thus, the pens containing one gram of each substance would be treated as two grams total under the guidelines.

would follow, and Agent Gibson's testimony that these sales were typically in the form of drums because that is how chemical companies package them; (4) the March 21, 2006, email from Cadavid to the confidential informant attaching a photograph of a twenty-five-kilogram drum in which he states "I am sending proof of what there is here" and attaches a sheet detailing the specifics for a drum of ephedrine at either twenty-five or fifty kilograms; (5) the May 17, 2006, email from Cadavid to the confidential informant in which he states "From don efra[7] there are 4000 pesos available, but this has to be quickly, because there are several people behind that," which Agent Gibson testified referenced either four kilograms of ephedrine or four twenty-five-kilogram drums; (6) the June 6, 2006, email from Cadavid to the confidential informant stating "two bottles and they belong to efrain," which Agent Gibson testified meant two drums of ephedrine; (7) intercepted calls between Cadavid and other individuals discussing unspecified large quantities of ephedrine; and (8) that Cadavid obtained his samples from Edgar Bohorquez, Cadavid introduced the confidential informant to Bohorquez, and Bohorquez sold one twenty-five-kilogram drum to the confidential informant in September 2006, three months after Cadavid's arrest. R. 61 (Sent. Hr'g. Tr. Part A at 7-10) (summarizing evidence); R. 68 (Sent. Hr'g Tr. Part 1 at 23-67) (testimony Agent Gibson). The district court, focusing on what conduct was reasonably foreseeable from the defendant's actions, found that Cadavid was accountable for twenty-five kilograms based on the "testimony, exhibits, [and] the argument[s]." R. 61 (Sent. Hr'g Tr. Part A at 22).

---

[7]Cadavid does not dispute that the subject of these emails was the sale of ephedrine, or that words like "Don efra" and "efrain" were code for ephedrine. R. 68 (Sent. Hr'g Tr. Part 1 at 30).

13

Cadavid argues primarily that any connection to twenty-five kilograms is speculative, based on unreliable hearsay, or based on Agent Gibson's erroneous interpretation of the coded emails. He offers no alternative explanation of the coded phrases in the emails that Agent Gibson argued referenced drums, e.g. "two bottles." Even were we to exclude the informant's statements Cadavid claims were not supported by documentary evidence,[8] there is ample evidence connecting Cadavid to the ultimate sale of a twenty-five-kilogram drum by Bohorquez, which Cadavid does not deny occurred three months after his arrest. Cadavid does not dispute that he put Bohorquez and the informant in touch, Cadavid admits he obtained the samples from Bohorquez, and Cadavid offers no alternative explanation for the contents of the emails that connect him to the sale of a drum. The evidence establishes Cadavid's knowledge of and association with the ultimate sale of a twenty-five-kilogram drum such that he can be held responsible for it even if he was not present for the transaction. *See Ledezma*, 26 F.3d at 645-46.

Cadavid's other attacks on the evidence are equally unavailing. The revelation that the photo of a twenty-five-kilogram drum Cadavid sent as an e-mail attachment was merely an image downloaded from a website and not an actual drum shows at most that Cadavid did not have a drum in his possession when he sent the email. However, the district court placed greater emphasis on the specification sheet in the email detailing the quantities available as either a twenty-five-kilogram or

---

[8]We need not and do not decide whether there were sufficient indicia of reliability under U.S.S.G. § 6A1.3 for the court to consider the statements of the confidential informant offered by Agent Gibson at sentencing, because the defendant's own statements and actions support the district court's findings.

fifty-kilogram drum. R. 61 (Sent. Hr'g Tr. Part A at 22). Nor must Cadavid have ever possessed the drum to be responsible for the greater amount. *See Ledezma*, 26 F.3d at 646. Given this record, we cannot hold that the district court committed clear error in finding Cadavid accountable for the twenty-five-kilogram drum that Bohorquez sold and not just for the two one-gram samples.

## B. Rule 32

Finally, we also reject Cadavid's argument that the district court failed to resolve properly the dispute over drug quantity. Federal Rule of Criminal Procedure 32(i)(3)(B), formerly Rule 32(c)(3)(D), requires a district court to make findings with respect to any controverted matter or else rule that a finding is not necessary. *United States v. Solorio*, 337 F.3d 580, 598 (6th Cir.), *cert. denied*, 540 U.S. 1063 (2003). At sentencing, Cadavid's counsel was given an opportunity to present evidence regarding his position on the drug quantity and declined to do so, relying solely on argument and his sentencing memorandum and exhibits. R. 61 (Sent. Hr'g Tr. Part A at 4). The district court then issued its findings of fact resolving the issue of drug quantity. *Id.* at 21. Cadavid's claim that his subsequent allocution created new disputes of fact that the district court failed to resolve lacks merit both because his allocution merely reargued the same dispute and because the district court heard all of Cadavid's arguments and reached the same conclusions following the allocution, which the district court then again stated on record. R. 66 (Sent. Hr'g Tr. Part B at 7-8) ("I believe the offense was intended to be a large amount of improper substance being sent privately to individuals here [in the United States]."). We hold the district court did not violate Rule 32.

## V.  CONCLUSION

For the aforementioned reasons, we AFFIRM Cadavid's conviction and sentence.