**Juan CADAVID–YEPES, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

No. 14–2210.

United States Court of Appeals, Sixth Circuit.

Jan. 6, 2016.

Before: MERRITT and MOORE, Circuit Judges; and MAYS, District Judge.[*]

KAREN NELSON MOORE, Circuit Judge.

Petitioner–Appellant Juan Cadavid–Yepes ("Cadavid") appeals from the district court's denial of his motion to vacate his sentence under 28 U.S.C. § 2255. Cadavid pleaded guilty, pursuant to a written plea agreement, to the importation of a listed chemical in violation of 21 U.S.C. § 960(d)(1) and 18 U.S.C. § 2. The charge arose out of Cadavid's involvement in shipping samples of chemicals used in the production of methamphetamine into the United States from Colombia. During his plea colloquy, Cadavid acknowledged that he and the government disagreed on the relevant drug quantity for the purposes of sentencing. After taking evidence at the sentencing, the district judge imposed a sentence pursuant to the government's recommended calculation. Cadavid appealed his guilty plea and sentence, and we affirmed. Cadavid subsequently filed a motion under 28 U.S.C. § 2255, arguing that his attorney was constitutionally ineffective because the attorney failed to obtain exculpatory evidence and because the attorney advised Cadavid that he was pleading to "time served." The district court denied Cadavid's motion. For the reasons discussed below, we **AFFIRM.**

## I. BACKGROUND

Cadavid was charged in a three-count sealed indictment in 2006 and was extra-

---

[*] The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

dited from Colombia to the United States. On December 4, 2008, a grand jury handed down a superseding indictment charging Cadavid with (1) conspiracy to manufacture a controlled substance, namely methamphetamine, in violation of 21 U.S.C. § 846; (2) conspiracy to possess a listed chemical—specifically, ephedrine and phenylpropanolamine ("PPA")—with the intent to manufacture a controlled substance, in violation of 21 U.S.C. § 846; and (3) importation of listed chemicals, in violation of 21 U.S.C. § 960(d)(1) and 18 U.S.C. § 2. R. 8 (Superseding Indictment) (Page ID # 18–20).

On September 9, 2009, Cadavid pleaded guilty to Count 3 pursuant to a written plea agreement. R. 44 (Plea Agreement) (Page ID # 75). According to the agreement, in May 2006 Cadavid sent a package by mail from Colombia to Detroit, Michigan. *Id.* at 2 (Page ID # 76). DEA agents seized the package and found that it contained two one-gram samples of ephedrine and PPA hidden inside of two ballpoint pens. *Id.* at 2 (Page ID # 76). Cadavid intended to ship the samples to an individual who he "believed represented drug traffickers in Michigan interested in purchasing large quantities of ephedrine and phenylpropanolamine for the purpose of manufacturing methamphetamine." *Id.* The individual to whom Cadavid sent the package, however, was a DEA confidential source. *Id.* Cadavid had been in contact with the confidential source since March 2006. *Id.* Over the course of several meetings and conversations, Cadavid had expressed to the confidential source that he represented Colombians "who were willing and able to sell large quantities of chemicals" to individuals in Michigan. *Id.* Cadavid sent the samples to Detroit in order for the chemicals to be "tested and evaluated by the prospective purchasers." *Id.* at 2–3 (Page ID # 76–77).

The written plea agreement indicated that the parties disagreed about Cadavid's Sentencing Guidelines range. *Id.* at 3 (Page ID # 77). According to Cadavid, the appropriate Guidelines range was 21 to 27 months of imprisonment because Cadavid was responsible for only the quantity shipped inside of the pens: "2 to 4 grams." *Id.* at 16 (Page ID # 90). The government, however, believed that the appropriate range was 97 to 121 months of imprisonment because Cadavid was responsible for "3 kilos or more ephedrine or PPA." *Id.* at 8 (Page ID # 82). This larger quantity was based on the sale of a drum of chemicals to the confidential informant that occurred in Colombia in September 2006, after Cadavid's arrest. R. 68 (6/9/10 Sentencing H'rg Tr. at 27) (Page ID # 257). According to the government, Cadavid brokered the deal and introduced the informant to the seller of the drum, Edgar Bohorquez. *Id.* at 26–27 (Page ID # 256–57). The plea agreement indicated that "[t]he Court is not bound by either party's recommendation . . . and defendant understands that he will have no right to withdraw his guilty plea if the Court does not follow his recommendation." R. 44 (Plea Agreement at 3) (Page ID # 77).

The plea agreement was written in English, which Cadavid—a native Spanish-speaker—does not speak. The district court used an interpreter to communicate with Cadavid during his plea colloquy. R. 46 (Plea H'rg Tr. at 3) (Page ID # 102). Cadavid confirmed during his plea colloquy that he discussed his plea with his attorney, that he went over the written plea agreement with his attorney, and that he was satisfied with his attorney's services. *Id.* at 6–7, 9 (Page ID # 105–06, 108). The district court also discussed the sentencing disagreement during the plea colloquy. *Id.* The district court confirmed that Cadavid understood that the government recommended 97 to 121 months of imprison-

ment, while the defendant recommended 21 to 27 months. *Id.* at 10–11 (Page ID # 109–10). The district court asked whether Cadavid understood that "[a]t the sentencing the Court will determine the proper guideline range." *Id.* at 11 (Page ID # 110). Cadavid responded "Yes, Your Honor." *Id.* Cadavid also indicated that he understood that the district court would "also look at other factors to determine the appropriate sentence." *Id.* Cadavid further affirmed that he understood that if the district court sentenced him "under either parties' [sic] guideline range," then he waived his right to appeal. *Id.* at 12 (Page ID # 111). Finally, the district court asked Cadavid whether there were "any side deals" made with his attorney and the government. *Id.* at 13 (Page ID # 112). Cadavid responded "no" and further affirmed that he was pleading guilty voluntarily. *Id.*

The district court held an evidentiary hearing on June 9, 2010 to determine the appropriate Sentencing Guidelines range. R. 68 (6/9/10 Sentencing H'rg Tr. at 1) (Page ID # 231). The government called DEA Agent Lance Gibson to testify regarding Cadavid's discussions with the confidential informant. *Id.* at 16 (Page ID # 246). Agent Gibson testified that the DEA's "informant was playing a broker role where he was making a deal between Cadavid and his drug trafficking organization in Detroit." *Id.* at 20 (Page ID # 250). According to Agent Gibson, Cadavid and the informant "discussed large quantities, multiple drums of Ephedrine," that Cadavid would be able to broker between Colombia and Detroit. *Id.* at 23 (Page ID # 253). Agent Gibson also stated that the informant told Cadavid that the ephedrine "was going to Detroit to be processed into Meth." *Id.* at 24 (Page ID # 254).

Agent Gibson testified regarding several email and phone conversations between Cadavid and the informant. *Id.* at 29–37 (Page ID # 260–67). Agent Gibson explained that Cadavid and the informant discussed ephedrine using code. *Id.* at 30 (Page ID # 260). In one email, Cadavid referred to "two bottles" that belonged to "Efrain." *Id.* at 34 (Page ID # 264). Agent Gibson explained that he understood this to be code for "two drums of Ephedrine." *Id.* Another email from Cadavid to the informant stated that there were "four thousand pesos available," which Agent Gibson believed represented either "four drums or 4 kilos" of ephedrine. *Id.* at 35–36 (Page ID # 265–66). Lastly, Agent Gibson testified to an email in which Cadavid told the informant that he was "sending proof" of what he had; Cadavid attached a listing of quantities that provided "25 kilograms and 50 kilograms." *Id.* at 36–37 (Page ID # 266–67).

Agent Gibson explained that, after Cadavid sent the samples to Detroit, the informant and Cadavid never consummated a deal for larger quantities because Cadavid was arrested in Colombia on unrelated drug charges. *Id.* at 26 (Page ID # 256). However, prior to his arrest, Cadavid introduced the informant to Bohorquez. *Id.* In September 2006, Bohorquez sold "one drum of PPA to the informant for $34,000," a transaction that occurred in Colombia. *Id.* at 27 (Page ID # 257).

The defense did not call any witnesses, but Cadavid's trial attorney cross-examined Agent Gibson. Agent Gibson acknowledged that he did "not have any emails specifying Detroit" as the ultimate location for the larger amount of chemicals. *Id.* at 39 (Page ID # 269). However, Agent Gibson maintained that "[f]rom day one when the informant and Cadavid talked about the deal, the deal was always that the Ephedrine was going to Detroit,

that's why the sample was ultimately delivered to Detroit." *Id.*

The district court found that the sale of the drum was relevant conduct for the purposes of Cadavid's sentence because the sale of the drum was reasonably foreseeable from Cadavid's activity. R. 61 (06/10/10 Sentencing H'rg Pt. A Tr. at 21) (Page ID # 179). The district court relied on the communications between Cadavid and the informant and that Cadavid sent the samples to Detroit. *Id.* at 21–22 (Page ID # 179–80). As the district court explained, it is reasonable to assume that the samples would be "followed up, if they're acceptable, by a larger quantity." *Id.* at 21 (Page ID # 179). The district court found this to be foreseeable conduct even assuming the "drum was going to be transferred over in Col[o]mbia for shipment to the United States." *Id.* Further, the emails and conversations between Cadavid and the informant indicated that Cadavid intended to broker a transaction for the larger quantity. *Id.* at 22 (Page ID # 180). Accordingly, the district court found the relevant drug quantity for the purposes of sentencing to be 25 kilograms, the size of the drum. *Id.*

Prior to sentencing, Cadavid allocuted and explained his defense. According to Cadavid, he obtained the ephedrine because it was legal in Colombia and the informant told him that the sale was between companies. *Id.* at 35 (Page ID # 193). Through his interpreter, Cadavid read from an email sent by "Bohorquez to the informant where they talk about getting the substance from company to company." *Id.* at 40 (Page ID # 198). Cadavid also discussed communications between

himself and the informant in which the informant told Cadavid that the other company was in Mexico. *Id.* at 41–43 (Page ID # 199–201). Cadavid explained that the sample was originally going to go to Mexico but that he was later told to send the sample to Detroit. *Id.* at 45 (Page ID # 203). Cadavid stated that whatever else happened "was beyond [his] knowledge." *Id.* at 46 (Page ID # 204). The district court then confirmed with Cadavid that Cadavid's argument was "that you really were not intending to send anything other than the sample to the United States and the other ephedrine was going to go not to the United States." *Id.* at 49 (Page ID # 207).

Following Cadavid's allocution, the district court considered the sentencing factors and imposed a sentence of 97 months of imprisonment, the low end of the government's proposed Guidelines range. R. 66 (6/10/10 Sentencing H'rg Pt. B Tr. at 9) (Page ID # 227).

We affirmed Cadavid's conviction and sentence on January 19, 2012. *United States v. Cadavid–Yepes*, 446 Fed.Appx. 802 (6th Cir.2012).[1] Cadavid argued that his guilty plea lacked a factual basis because he believed the sale was a lawful transaction between companies, and thus there was no evidence that he intended for the imported chemicals to be used to manufacture methamphetamine. *Id.* at 807. We disagreed, noting that the written plea agreement, signed by Cadavid, "unequivocally set forth" that Cadavid sent a package to a DEA confidential source that he "believed represented drug traffickers in Michigan interested in purchasing large

---

1. Cadavid's plea agreement contained a waiver-of-appeal provision. Cadavid argued that the plea agreement did not bar his appeal if he was sentenced above the 21–27 month range that the defense recommended. *See United States v. Cadavid–Yepes*, 446 Fed.Appx.

802, 806 (6th Cir.2012). Although we found that "Cadavid's argument strains the text," we noted ambiguity in the agreement and assumed without deciding that Cadavid had not waived his right to appeal. *Id.*

quantities" of the chemicals for the purpose of manufacturing meth. *Id.* at 807–08. Moreover, the coded emails from Cadavid to the confidential informant, as well as the fact that the samples were hidden inside of pens, established that Cadavid knew that the transaction was unlawful. *Id.* at 808. We also rejected Cadavid's argument that his sentence was procedurally unreasonable because the district court held him accountable for the 25–kilogram drum. We noted that the "government offered seven pieces of evidence to establish that Cadavid was accountable for the twenty-five-kilogram drum and not just" the samples. *Id.* at 809. This evidence included Agent Gibson's testimony, the emails between Cadavid and the informant, Cadavid's sending of samples to Detroit, and Cadavid's introduction of the informant to Bohorquez. *Id.* at 809–10. Although several of Cadavid's arguments suggested that his attorney may not have properly explained his plea agreement or other matters to him, we noted that these arguments were "best reserved for a motion under 28 U.S.C. § 2255." *Id.* at 806 n. 3 & 807 n. 4.

Cadavid filed a 28 U.S.C. § 2255 motion on February 11, 2013. R. 75 (Mot. to Vacate at 1) (Page ID # 399). Cadavid argued that his trial counsel, Joseph Niskar, was ineffective for four reasons: First, Niskar "failed to adequately explain the terms and conditions" of the written plea agreement, leading Cadavid to believe that he was pleading guilty in order to receive "time served." *Id.* at 2 (Page ID # 400). According to Cadavid, Niskar promised that they would meet with an interpreter to go over the terms of the plea agreement, but Niskar arrived without an interpreter and met with Cadavid only briefly, explaining "that his plea of guilty would be for time served." *Id.* at 18 (Page ID # 416). Second, Cadavid argued that he was denied effective assistance of counsel because his attorney failed to respond to his "numerous letters and emails" advising his attorney "that the discovery provided by the government was not complete and that important documents were missing" that "would have provided a substantial defense to the charges against him." *Id.* at 3 (Page ID # 401). According to Cadavid, the "missing discovery consisted of communications ... supporting Mr. Cadavid's position that any subsequent transaction" apart from the samples inside of the pens would take place outside of the United States. *Id.* at 16 (Page ID # 414). Third, Cadavid argued that Niskar was ineffective at his sentencing evidentiary hearing "because Mr. Niskar did not obtain" the documents that Cadavid requested, which would have allowed him to challenge Agent Gibson's testimony. *Id.* at 3 (Page ID # 401). Finally, Cadavid claimed that Niskar was ineffective because "he failed to review the Extradition Resolution" and obtain credit for time served for the time that Cadavid spent in a Colombian prison prior to his extradition. *Id.* Cadavid requested an evidentiary hearing and that the court "[i]ssue an order vacating and setting aside his plea and/or his sentence." *Id.* at 4 (Page ID # 402).

The magistrate judge issued a report and recommendation on April 18, 2014 recommending that the district court grant an evidentiary hearing for Cadavid's first two claims. R. 81 (R. & R. at 1) (Page ID # 586). According to the magistrate judge, these claims relied on Cadavid's "continued assertion that he never knew the large quantities of Ephedrine and PPA would ultimately be shipped to the United States" and that "he would have proceeded to trial had his attorney provided him with constitutionally adequate assistance." *Id.* at 11 (Page ID # 596). The magistrate judge noted that if Niskar had provided effective assistance, "rejecting the Govern-

ment's plea offer may have been rational under the circumstances." *Id.* at 18 (Page ID # 603). The magistrate judge did not address Cadavid's third claim, that Niskar was ineffective at sentencing for failing to obtain the additional evidence, because this claim would necessarily be decided by the resolution of Cadavid's second claim. *Id.* at 19 (Page ID # 604). Lastly, the magistrate judge recommended denying Cadavid's claim that his attorney was ineffective regarding the extradition resolution. *Id.* at 20 (Page ID # 605).

The government objected to the magistrate judge's recommendation of an evidentiary hearing for Cadavid's first two claims. R. 82 (Gov't Obj. to R. & R.) (Page ID # 608). Cadavid responded to the government's objections, but did not raise objections to the magistrate judge's report and recommendation. R. 83 (Pet. Resp. to Obj. at 1) (Page ID # 629).

The district court denied Cadavid's motion on July 17, 2014. R. 85 (7/17/14 Dist. Ct. Op. at 1) (Page ID # 650). The district court found that, after "a very thorough and probing plea colloquy at which [Cadavid] had an interpreter," Cadavid stated that he was satisfied with counsel, that he understood that his sentence could be 97 to 121 months of imprisonment according to the government's worksheet, and that he understood that the ultimate sentencing decision would be up to the district court. *Id.* at 2 (Page ID # 651). The district court concluded that Cadavid's "testimony, as set forth in the plea proceeding transcript, clearly rebuts any claim that he could assume that some other lesser sentence, much less time served, was guaranteed by his guilty plea to Count 3." *Id.* The district court also emphasized that it assumed during sentencing "that the sale and transfer of the 25 kilogram drum would have occurred in Col[o]mbia or Mexico (not the U.S.)" and thus there was "no need for further testimony to establish this factual scenario." *Id.* at 3 (Page ID # 652).

■ Cadavid filed a Notice of Appeal on September 10, 2014. R. 86 (Notice of Appeal) (Page ID # 670). This court granted a certificate of appealability on February 5, 2015, observing that the conflicting opinions of the magistrate judge and the district judge evidenced that reasonable jurists could disagree as to whether Cadavid's claims had merit. R. 90 (02/05/15 6th Cir. Order) (Page ID # 691).[2]

## II. ANALYSIS

### A. Standard of Review

"We review de novo the denial of a federal prisoner's motion to vacate, set aside, or correct a sentence, but will overturn a district court's factual findings only if they are clearly erroneous." *Pough v. United States,* 442 F.3d 959, 964 (6th Cir. 2006). "The district court's decision whether to hold an evidentiary hearing on a Section 2255 motion is reviewed under the abuse of discretion standard." *Smith v. United States,* 348 F.3d 545, 550 (6th Cir.2003). The district court must hold an evidentiary hearing "unless the record con-

---

**2.** The government notes that, on October 24, 2014, Cadavid "was released by the Bureau of Prisons upon completion of his prison sentence." Appellee Br. at 9. According to the government, Cadavid "was deported to Colombia and is serving a non-reporting term of supervised release." *Id.* Because Cadavid filed for relief while he was still imprisoned, and because he remains on supervised release, Cadavid is "in custody" for the purposes of § 2255, and his release from prison does not affect his ability to challenge his guilty plea and current sentence. *See Pola v. United States,* 778 F.3d 525, 529–30 (6th Cir. 2015); *see also Maleng v. Cook,* 490 U.S. 488, 490–92, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).

clusively shows that the petitioner is entitled to no relief." *Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir.1999) (internal quotation marks omitted).

In order to obtain relief under § 2255 a prisoner must establish "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett v. United States,* 334 F.3d 491, 496–97 (6th Cir.2003) (internal quotation marks omitted). Here, Cadavid argues that he is entitled to relief because his attorney was constitutionally ineffective. Accordingly, Cadavid must establish "(1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different." *Griffin v. United States,* 330 F.3d 733, 736 (6th Cir.2003) (citing *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To satisfy the prejudice requirement in the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 58–59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

### B. Cadavid Cannot Establish Prejudice Resulting From His Attorney's Alleged Failure to Obtain Exculpatory Evidence

■ Cadavid first argues that his attorney failed to obtain "communications (recorded phone conversations and emails) supporting Mr. Cadavid's position that any subsequent transaction would take place completely in Colombia or alternatively Mexico, where the chemicals are legal, and not in the United States, and that the chemicals would not ultimately be shipped to the U.S.A." Appellant Br. at 13. These communications consisted of emails from the informant to Cadavid "that referred to an intention to ship ephedrine from Col[o]mbia to Mexico," phone conversations between Cadavid and the informant, "[t]ranslations of emails to English," and various unspecified "[d]ocuments and correspondences." Appellant Br. at 14–15. According to Cadavid, these documents "would have constituted a substantial defense to the charges, and would have been important for the sentencing evidentiary hearing to establish facts in mitigation of sentence and to impeach the DEA agent." *Id.* at 13.

This argument is not persuasive. Cadavid argues that the exculpatory evidence would have proven that he did not intend for the drum to arrive in the United States. *See* Appellant Br. at 13. But Cadavid was charged for knowingly shipping samples of PPA and ephedrine into the United States, conduct that he does not dispute. *See* R. 8 (Superseding Indictment) (Page ID # 18–20); R. 46 (Plea H'rg Tr. at 13–14) (Page ID # 112–13). Cadavid fails to explain how missing exculpatory evidence relating to the sale of the drum could "constitute[ ] a substantial defense to the charges" against him, nor does Cadavid explain why he would have "insisted on going to trial" if his attorney had produced this evidence. *See Hill,* 474 U.S. at 58–59, 106 S.Ct. 366. Accordingly, Cadavid has not established that the alleged missing exculpatory evidence prejudiced him in entering his guilty plea.

■ Furthermore, Cadavid cannot show that he was prejudiced at his sentencing hearing. The district judge found that the sale of the drum was "relevant conduct" for the purposes of calculating the appropriate drug quantity. R. 61 (06/10/10 Sentencing H'rg Pt. A Tr. at 21) (Page ID

# 179). As we explained in Cadavid's direct appeal, under U.S.S.G. § 1B1.3, "[r]elevant conduct includes 'all quantities of drugs with which [the defendant] was directly involved and, in the case of joint criminal activity, all reasonably foreseeable quantities.'" *Cadavid–Yepes*, 446 Fed. Appx. at 809 (quoting *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir.1994)). Even if Cadavid obtained the evidence that he seeks, he cannot demonstrate that "there is a reasonable probability" that "the result of the proceeding would have been different" with this evidence. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. During Cadavid's allocution at sentencing, Cadavid explained that the confidential informant represented to him that the transaction was "from company to company" and that the future sale was to occur in Mexico, not the United States. R. 61 (06/10/10 Sentencing H'rg Pt. A Tr. at 45) (Page ID # 203). Cadavid provided e-mails to the district court that suggested that the future transaction was to occur in Mexico and not the United States. *See id.* at 34–45 (Page ID # 192–203). Cadavid explained that he was originally told to ship the samples to Mexico, but was later instructed to ship them to Detroit. *Id.* at 45 (Page ID # 203). The district court clearly understood Cadavid's argument, and confirmed this with Cadavid. *Id.* at 49 (Page ID # 207). Nonetheless, the district court believed that it was "reasonably foreseeable" to Cadavid that the larger quantity was to be shipped to the United States, even on the assumption that the sale of the drum was to occur in Colombia, because Cadavid knowingly sent the samples into the United States. *Id.* at 21–22 (Page ID # 179–80). Again, Cadavid admits that he was instructed to send the samples to Detroit and he does not dispute that he did so. Further, the plea agreement that Cadavid signed explicitly states that Cadavid intended to ship the samples to individuals that he "believed represented drug traffickers *in Michigan* interested in purchasing large quantities of ephedrine and phenylpropanolamine for the purpose of manufacturing methamphetamine." R. 44 (Plea Agreement at 2) (Page ID # 76) (emphasis added). Accordingly, Cadavid cannot demonstrate that he was prejudiced from the alleged missing evidence. This is particularly true given that Cadavid was a party to the alleged exculpatory conversations between himself and the informant, *see* Appellant Br. at 14–15, and thus he knew the content of those conversations. Because Cadavid cannot demonstrate prejudice arising from his attorney's errors, the district court did not err in denying Cadavid's § 2255 motion.

## C. Cadavid Cannot Establish Prejudice Resulting From His Attorney's Alleged Assurance That His Plea Was For "Time Served"

Cadavid also argues that his trial counsel, Niskar, was ineffective because Niskar represented to Cadavid that he was pleading guilty in exchange for receiving 27 months of imprisonment. Appellant Br. at 22–24. Cadavid thus claims that he entered the guilty plea on the understanding that he would be released on "time served." *Id.*

Even on the assumption that Niskar told Cadavid that he was pleading to time served, however, Cadavid cannot establish that he was prejudiced by Niskar's misrepresentations. Our cases demonstrate that, even if counsel gives a defendant erroneous information, a defendant is not entitled to relief if the misinformation is "directly refuted on the record" by the district judge during a plea colloquy. *See United States v. Todaro*, 982 F.2d 1025, 1029 (6th Cir.1993). This is because the district court's proper plea colloquy "cure[s] any misunderstanding [a defendant] may have

had about the consequences of his plea." *Ramos v. Rogers,* 170 F.3d 560, 565 (6th Cir.1999).

Cadavid argues that this precedent does not bar his claim because his attorney's promise of "time served" was not refuted by his plea colloquy. Appellant Br. at 24. He further emphasizes that the plea agreement was not prepared in Spanish and that he accordingly "lacked an understanding of the key provisions in the plea agreement and of the important rights he was waiving." *Id.* at 24–25. These arguments are unavailing. Cadavid had an interpreter during his plea colloquy. R. 46 (Plea H'rg Tr. at 3) (Page ID # 102). Through this interpreter, Cadavid affirmed that he had conferred with his attorney "at length" prior to his plea hearing and that he was satisfied with his attorney's representation. *Id.* at 4–5, 7 (Page ID # 103–04, 106). Cadavid stated that he went over the plea agreement with his attorney prior to signing the agreement. *Id.* at 9 (Page ID # 108). He then acknowledged to the district judge that he understood that "the government believes that the guideline range is 97 to 121 months," *id.* at 10 (Page ID # 109), and that "[t]he Defendant recommends that the guideline range should be 21 to 27 months," *id.* at 11 (Page ID # 110). Cadavid affirmed that he understood that "[a]t the sentencing the Court will determine the proper guideline range" and that the court "must also look at other factors to determine the appropriate sentence." *Id.* Cadavid also acknowledged that, if the district judge imposed "either parties' [sic] guideline range," he "waive[d his] right to appeal the conviction or sentence." *Id.* at 12 (Page ID # 111).

The record is thus clear that Cadavid "was given the correct sentencing information by the judge" regarding the potential Guidelines ranges and that Cadavid entered his guilty plea knowing that the district court could impose the government's proposed sentence after a sentencing hearing. *See Todaro,* 982 F.2d at 1030. Given his thorough plea colloquy with the district court, Cadavid cannot now claim, in direct contradiction to his assertions under oath, that he believed that he was entering into a different agreement. *See id.* at 1029–30; *see also Ramos,* 170 F.3d at 566.[3] Because his proper plea colloquy cured any misrepresentation that Niskar may have provided, Cadavid cannot establish prejudice.

---

**3.** Cadavid relies on several recent Supreme Court decisions that relate to the effective assistance of counsel during the plea bargaining process, arguing that these opinions render cases such as *Todaro* and *Ramos* "of questionable precedential value." *See* Reply Br. at 13. These recent Supreme Court cases, however, are consistent with the reasoning of *Todaro* and *Ramos.* In *Lafler v. Cooper,* —— U.S. ——, 132 S.Ct. 1376, 1386, 182 L.Ed.2d 398 (2012), the defendant "went to trial rather than accept a plea deal, and it [was] conceded this was the result of ineffective assistance during the plea negotiation process." Lafler, unlike Cadavid, was never given a plea colloquy that "cur[ed] the error" of defense counsel. *Id.* To the contrary, Lafler's ensuing trial "caused the injury from [defense counsel's] error" because the defendant received a more severe sentence at trial. *Id.* Similarly, in *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1404, 182 L.Ed.2d 379 (2012), Frye's attorney never told Frye about a plea offer from the government and the offer expired. Frye later pleaded guilty without any plea agreement, unaware of the earlier offer. *Id.* Like Lafler, Frye was never given a plea colloquy capable of curing his counsel's deficient performance. Lastly, *Padilla v. Kentucky,* 559 U.S. 356, 359, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), held that Padilla's counsel rendered deficient performance by not advising Padilla about the deportation consequences of pleading guilty to drug charges. The Court did not reach *Strickland's* prejudice prong in *Padilla,* the prong at issue here. *Id.* at 369, 130 S.Ct. 1473.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.